Good morning, Your Honors. May it please the Court. At about 1.40 this morning, my eyes had begun to roll into the back of my head as I was trying to make it through another one of these 20-page opinions dealing with this immunity issue that the Court is going to be dealing with today. If it was the Bobo case, I hope it was because you were just saying that I'll never know as much about the law as this Court does. And I realize at that point, my job, I believe, today is to try to find the humanity in all of these opinions and the law. Because ultimately, this thing that we call the law is supposed to serve the citizens who live our lives under its watchful eye. Right. Counsel, I'm sorry to interrupt, and I understand what you're saying, but we still ultimately have to have a legal basis for any decision that we make. And so, it seems to me that based on the case law in this circuit, that the TVA, in its energy-producing capacity, is carrying out a government function. And so, the question then seems to me to be whether there are any regulations that would have limited their discretion, regulations or other forms of law that would have limited their discretion in how they conducted the operations on that day. It's obviously very tragic what happened to your clients. Yes, Your Honor. But we still have to deal with the law as it exists. So, if you could maybe focus for me on that. I did not see, I saw that you referred to OSHA as a whole, but I did not see where you specified any particular form of law that was violated here. Yes, Your Honor. Our allegations were, in essence, that by dropping the cable into the water, the TVA had created a hazard. That when it then made the decision, and there might be some discretion, Your Honor, involved in the decision to post boats out there to warn other boaters of the cable that's in the water. But that once they'd made that decision, then because the cable is in that 100-yard wide channel of the Tennessee River, that those boats had to stay in that area and warn boaters. Instead, the boats had moved over to the northern shore where they could not serve the function of warning boaters to stay out of that channel where the danger existed. But I say our because I agree with everything that Judge Rosenbaum said. Our question is more premised on the point that even if subcontractors impute everything to TVA, even if TVA was grossly negligent, under the discretionary function exception, you still have to show that that discretionary decision they made that was grossly negligent violated some restriction on their discretion. Because Congress has said, federal government has said, I don't have to respond to any of these lawsuits. I could be immunity to a certain extent. And then the courts have interpreted that waiver as meaning, okay, it doesn't apply where there's a discretionary function, where you could do one thing or could do another thing. And then we've interpreted, the Supreme Court's interpreted into that and we've followed it, that there are exceptions to even a discretionary function. And one of the exceptions, actually, the primary one, certainly, and probably the only one is, if your discretion has been limited by a standard that the government has adopted, like the OSHA regs or EPA regs or any of that, you can adopt your own restrictions. We had some of that in function that you have discretion to determine, that the government has discretion to determine how it's going to be exercised. Then it's covered by the exception for the discretionary function to the waiver of immunity. So, there isn't, so far as I could tell from the briefs and the lower court orders, there isn't any limitation that, there's no OSHA rule that says, when you're moving these lines, you can't do that. There's no federal power regulation. I'm sure there's some federal agents that regulate the power lines. There's none, so far as the briefs indicate and the orders indicate, saying you can't do what they did. Is there, or are we missing something? Your Honor, I don't know the answer to that question. And part of the reason, from a factual point of view, we don't know the answer to that question is because we never were any discovery. And so, I think that with discovery, we might have a better answer to that very question. Of course, to the extent their regulations are published restrictions of that nature, you can find them, or at least some folks can find them online. But you're saying that TVA may have some internal restrictions that you weren't allowed to look for. That is certainly what we had believed the case might be and why we had asked the district court if it would allow us to do some discovery. Was that a 56-F kind of motion? I mean, what did you, did you tell the district court, look, there's this discretionary function exception, and we need to look for restrictions on TVA's discretion that TVA may have adopted internally itself that are not otherwise available to us? Your Honor, I don't know if we worded it as specifically as that. What we did say was that the motion to dismiss, because it had the declaration attached to it, was akin to a motion for summary judgment that we had not been allowed to do any discovery. And we asked the court to allow us to do some discovery. The court went on and held a hearing on the motion to dismiss, however, and... Sometimes that can be interpreted as a request for discovery into the facts of the declaration. What specifically did the declaration say that you wanted discovery into? It asserted that the, in just a bald assertion, as I recall, Your Honor, that the TVA was asserting the discretionary immunity doctrine in defense and that every decision that was made out there on the river that day, in essence, was a discretionary decision. I don't have it sitting in front of me, and I did not look at it last night, Your Honor. What we would say to the court is this, that the Pettibone decision was decided prior to Meyer and Leffler were decided by the U.S. Supreme Court. And specifically, Judge, with regard to the I'm assuming one of the opinions that the court is referring to, I would point out this issue. In the Pettibone decision, this court was dealing with the issue of the TVA employee's liability. Prior to, the court will recall, right after Pettibone came out, there was a statute passed by Congress that dealt with the fact that the exclusive remedy would be to sue the TVA. And so it said that if a TVA employee is sued, then that TVA employee, in essence, has complete immunity because you substitute the TVA for that employee. The reason that we believe that is important to this court is because at the time Congress did that and revised the statute or created a statute that said the TVA shall be substituted in for employees. What the Congress did not do was it did not revise the sue and be sued clause or limit it in any fashion. And we would therefore say to the court that Johns versus Pettibone is not the controlling opinion. And we would direct the court to the Leffler and the Meyer decisions that came out, excuse me, in 1994 and 1998, respectively. Because it's in those opinions that the U.S. Supreme Court said that the 11th Circuit, all the circuit courts would need to look at those three factors that are set out in the Meyer and the Leffler opinions. But the sue and be sued clause was in there since 1933. Yes, Your Honor. All the discretionary function immunity cases and decisions have come out since then. So all of them recognize that sue and be sued is not, does not bar the existence of and the development of a discretionary function exception. I mean, how can that be otherwise? I would point the court to the opinion and it is a district court opinion in Grant versus TVA, that came out of the Eastern District of Tennessee in 1942. To our knowledge, that's the earliest opinion where a court was dealing with the distinction. We're not bound by district court decisions and up until, including this week with the Bobo decision or last week, whenever it finally got out. We say the sue and be sued clause, here's the discretionary function exception. And we're going to apply the discretionary function exception. It doesn't apply in this particular case, but all of those decisions, a long line of them, have applied and either found that it barred the lawsuit or found that it didn't because of self-imposed restrictions or government-imposed restrictions, have applied the discretionary function exception with the sue and be sued clause in the statute. I didn't really get your argument about that unless the entire line of discretionary function cases are wrong. We believe that the better analysis is the analysis used by the Second and Fourth Circuit Courts in the North Carolina and Connecticut opinions, Your Honor. And I also, I guess, would point this out to the court. Even if this court has determined that this type of conduct, rather than being commercial conduct as we have asserted it should be considered, if this court believes that it is, in fact, the type of conduct to which the discretionary immunity clause should be applied, the court still must make that determination as to whether or not even this conduct, if it is subject to that discretionary immunity, if, in fact, it is the type of conduct that this court should immunize. I don't understand. We've got discretion not to apply and honor the discretionary function test exception. I'm out of time, Your Honor, if I may answer that question. The court does have the power to, even if discretionary immunity applies, of looking at it and determining is this, in fact, the type of conduct that is, that is policy, public policy consideration type decisions to which the immunity should apply. Well, I disagree about, not to disagree with the fact that we look at that, but that is where you determine if the discretionary function test is to be applied to start with. Is this a discretionary function? Does it deal with kind of policy decisions in the broad, indirect sense? But it's the same thing. I thought you were arguing that the Burr test has to be applied. And we've had case after case that's applied to discretionary function exception without saying a word about the Burr test. But you've got your three minutes in response. We'll hear now from Mr. Small. May it please the court, I'm Edwin Small for the Tennessee Valley Authority today. Mr. Small, it would help me if you would address first his argument that your declaration, at least implicitly, said we haven't done anything to undermine our discretionary authority. There's nothing that applies that would do so. And that he asked for discovery and was denied it. Yes, Your Honor. A couple of responses to the asking for discovery and it was denied. Number one, and I'm going to answer the court's question more specifically, but number one, in the plaintiff's appellate brief, there is no claim of error on denial of discovery. I understand that and that may be the end of it, but... Okay. So what discovery was there? TVA, after this accident, did a very thorough investigation. And I think either three or four months after the accident, that accident report was released to the public. And so the plaintiffs have had that accident report. And that accident report talks about the facts of the situation. It provides a timeline. It provides diagrams. It provides photographs. So there was a lot of discovery in that accident report. Yeah, that's about the facts and what happened. But the point of his argument, maybe it's my argument, is that if you go up and say, here's the declaration. This was all within our discretion. There's no, and you implicitly say there's no restrictions on our discretion. It's a policy based discretionary decision. He ought to be allowed to say, let me see your internal documents about how power lines should be moved and how subcontractors should be instructed and all that kind of stuff. Because one way that a, what would be a discretionary function can become non-discretionary is if you adopt formal restrictions on it. That's exactly correct, Your Honor. So why shouldn't he be, shouldn't, if it were presented and argued here, why shouldn't he have been allowed discovery into whether you have any internal restrictions? And Bobo, one of the internal restrictions was the memo that TVA adopted his policy and distributed to everybody. Yes, Your Honor. I would note that in the accident report that was made public, one of the conclusions was that all required clearances and applicable safety measures were in place. Yeah, but suppose he says, lie, lie, our pants on fire. I want to see for myself. I mean, that's what discovery is about. Yes, Your Honor. The affidavit recall that the key allegation is, is that the two patrol boats were not properly deployed. They should have been deployed in some other manner. The declaration of the supervisor of those patrol boats is, is mentioned in our appellate brief. And of course, the supervisor says that to the best of his knowledge, there is no rule restriction, anything that required him to deploy those patrol boats in a manner different than what he did in trying to stop the boating traffic coming from up and down the river. But there could have been some other kind of restriction that might have affected the decision. Is there anything that speaks to all possible internal policies, regulations, whatever the case may be? I don't think, no, there's no statement like that to my knowledge, Your Honor. The statements all went towards the allegations of negligence in the complaint. And recall that in the complaint, although not focused on here today, there were many allegations of negligent hiring, negligent supervision, negligent training, all kinds of things. The case is now, of course, boiled down and is focused on a very narrow thing. And of course, what we heard today was the focus is on the deployment of the two patrol boats in the particular locations in the river. And of course, the, as indicated by the affidavit in this case, the two patrol boats were deployed. They were intercepting traffic that was coming up and down the river and stopping the boats. And this particular boat was coming down the river so fast and the relative locations were such that the TVA, neither TVA patrol boat could intercept this particular vessel. And of course, the other thing that I would note was that this particular section of the river, a half mile above, a half mile below, had been closed by the Coast Guard, closed all traffic. No traffic was supposed to be coming through here. That restriction was put up immediately after the incident happened that afternoon about 2.30. And then this accident occurred three hours later at 5.30. How did the boat get through if it was closed? Your Honor, the boat simply ignored the Coast Guard's restrictions. When you say closed, you don't mean physically closed? No, Your Honor. The way it works, it's much like... I know what you're talking about. Sometimes areas are closed to fishing, or they're closed to outboard motor boats and so forth and so on, and big vessels. Correct, Your Honor. It's much like when the President visits an area or there's a large vessel that's particularly sensitive in an area, the Coast Guard will close that area. They issue notice, what's called notice to mariners, and those broadcast notice to mariners close that area. It's much like the FAA will close certain airspace. And that had been done here because the line had fallen. And then, of course, the line and falling did not strike the plaintiff's vessel or the plaintiff. It was three hours later, and the decision-making here that caused this accident was, of course, the decision to pull it up out of the water. And during this one particular time, it was hanging low over the water, and that's when the plaintiff's vessel came along. Let's go back to the real problem, though, that I think my two colleagues had pointed out here, and that is the FACERS cite no mandatory regulations or internal policies that TVA failed to follow. And I think the burden is on them. The problem I'm having after listening to this exchange is, how do they do that without some kind of discovery? Your Honor, it may not be possible to do without discovery, or it may be possible to identify things based on the accident reports. Remember, there was the TVA accident report. The Alabama authorities also issued a public report on this. It was covered by a lot of local press. So, the facts are well known. And if plaintiffs, and I know it's the legal point, make no mistake about it, but the plaintiffs did not seek through a Rule 56 affidavit any further discovery. And they had lots of discovery. I know for a fact, for example, that they were allowed to come on TVA premises and inspect the machinery that was involved, inspect the broken cable, and so forth. There's parallel state court litigation that's been going on for several years against TVA subcontractors. They ask for any, he says they ask for more discovery and weren't allowed. Sometimes when people say they ask, it's sort of like saying the water's closed. That means it's in opposition to judgment. Some of the judgment, I guess, 12B600K. But did they ask for discovery at any point into the, into whether there were any restrictions internally on your discretion and how this was to be done? In other words, did they ask for any guidelines or rules or agreements between you and the subcontractors as to how this should be done and what should be avoided and not avoided? My recollection is no, Your Honor, that there's nothing in the record as to any such request. Okay. Anything else? Basically, no, Your Honor. I would simply point out that a couple of things to just clarify for the court to try to make sure that we don't get crosswised with anything. At one point in their plaintiff's reply brief on page 15, they say at point 24, the TVA has successfully argued that it is not part of the executive branch and say, cite TVA, the EPA, which is a decision of this court in 2002. That's an incorrect statement, Your Honor. In that case, TVA said it was part of the executive branch. And a major issue in that case, which this court decided, was whether you can have a justifiable case of controversy between two executive department agencies. So the entire decision goes off on the basis that TVA is an executive agency. The other thing I would point out in plaintiff's reply brief, and I pointed out simply because we didn't have a chance to respond, is on page seven of the brief, they refer to the Suits and Admiralty Act. We analogize to the Suits and Admiralty Act in our main brief. They say the analogy is not good because the Suits and Admiralty Act only goes against the United States. And they emphasize against the United States. I would point out to the court that the Suits and Admiralty Act on its face applies to the United States or any wholly owned federal corporation, and that TVA is a wholly owned federal corporation. So the Suits and Admiralty Act analogy is really dead on because it applies to both the United States and a wholly owned federal corporation such as TVA. It was one of the first federal corporations in 19, well, I'm sure. 1933, Your Honor. Yeah. It was Sparkman, Hillsdale, and Morris, and the whole business. I spent a couple hundred hours reading original congressional documents on that and some tilting at the windmill lawsuit early, early on. But yeah, that won't hold water. The whole reason they're put up as a separate government corporation with the sue and be sued clause is so that it's not a part of one branch or the other, really. It's in the executive branch, but then it's not always in the executive branch. And that's what gave rise, as I understand it, to a lot of the discretionary function immunity cases and so forth and so on. But that's not here nor there in this case. Let's hear from Mr. Cole's remaining three minutes. Thank you, Your Honor. If you don't have anything else. I have nothing further, Your Honor. Can you tell us specifically where in the record? I want a specific place in the record where you asked this district judge to permit you to have some more discovery. And he said, I'm not going to grant you any more discovery. As I stand here right now, Your Honor, I cannot point you to that. It is my belief that we did, in fact, file a 56F affidavit informing the district court that we were requesting the opportunity to do discovery. My co-counsel and I, however, cannot. I was just asking him, as I said at the table, where that was. And I can't point you to it as I stand here right now. But I believe that it is in this record, Your Honor. Well, that's pretty important. I'm understanding that now, Your Honor. Even if we could find it, it doesn't seem like it's in your brief, in your opening brief anywhere. Why would that not be a waiver? I am concerned, Your Honor, that we might have, in fact, not addressed it in the initial brief. I believe that we had raised it, but once again, Judge, I can't point you to a sentence in the brief that mentions it as I stand here right now. And I'm sorry for that, but I cannot. What I would tell the court is that the discretionary immunity analysis that we're discussing, we believe under the case law, should be applied only to what are referred to as wholly governmental functions. In other words... Don't we have precedent holding that the distribution of power is a TVA function to which the discretionary function exception applies? The earliest pronouncement on that that I'm aware of, Your Honor, is that Grant versus TVA opinion where it drew the distinction that, in fact, the production and distribution of power was, in fact, a commercial activity. I thought we had at least one decision, maybe a run of decisions, applying the discretionary function immunity to the distribution of power. I know the Sixth Circuit has done that. And it did it on a dam and distribution safety issue. Yes, Your Honor. In Edward's case. And we believe that the better analysis is the analysis offered by the Second and Fourth Circuits in the Connecticut and North Carolina opinions where they indicated that we needed to go through the three-step analysis and that if, in fact, there was no interference, if allowing the lawsuit would not constitute any type of grave interference with a governmental function, then the discretionary immunity doctrine should not be provided as a defense to the TVA. Didn't we just sort of effectively find again that the power producing function of the TVA is a governmental function in Bobo, which was issued yesterday? I mean, he was working at a nuclear facility, right? He was working at a nuclear facility. And, Your Honor, I was not aware that the Bobo opinion had come out last night. I have not had a chance to read it. So, I can't address what the court said in that opinion. Well, in the 1988 and the Pettibone decisions, we held that TVA employees, through the immunity of TVA, were immune from a case involving an independent contractor's injury from a TVA power line in one of its power plants. Now, under your position, as I just heard it, that's a governmental function power provision. And therefore, TVA immunity doesn't apply. But we held in Pettibone it does. In that case, Your Honor, the TVA hired an independent contracting company to design, fabricate, and erect the gas desulfurization system. But the court, as we read that opinion, did not hold. What the court's holding was, was dealing with the issue of whether the decision to give the safety authority to the contractor was one of these discretionary decisions. And the court found that that was. That only makes sense, counsel, if the discretionary function exception applies to the generation and distribution of power. I mean, that's what that case was about. That's why the person got killed, was energy production and distribution. And we applied the discretionary function exception in that case. Yes, sir. And, well, I'm out of time, Your Honor. Okay. Thank you, counsel. Thank you. Thank you. All right. We will next hear Wells versus